**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **HOMERO REYES REYES, MANUEL OZUNA CHAVEZ, LUIS ACUNA, ANTONIO DE LA ROSA, FELIPE AREVALO GONZALEZ, JUAN ANTONIO CANTU GONZALEZ, and JUAN LOPEZ ESCAMILLA,** | § § § § § § | |
| | § | **Civ. No. _____** |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **JAVIER CHAPA, CHAPA GLOBAL CONTRACTING, INC., and REMINGTON SEEDS, LLC,** | § § § | |
| | § | |
| **Defendants.** | § | |

**PLAINTIFFS' ORIGINAL COMPLAINT**

I.    **Introduction**

1.    This case is brought by a group of migrant farmworkers who were recruited by Defendant Javier Chapa ("Chapa") to work in seed corn processing in Iowa for Defendant Remington Seeds, LLC ("Remington").

2.    Plaintiffs worked for Chapa and Remington each year from late August until late September or early October. Plaintiffs worked in Remington's seed corn processing facility in Davenport, Iowa.

3.    While working for Chapa and Remington, Plaintiffs were required to stay in hotel rooms procured by Chapa in Clinton, Iowa.

4.    Plaintiffs were required to sleep 3 or 4 to a room, either sharing beds or sleeping on the floor to avoid sharing beds.

5.      Plaintiffs were required to reimburse Chapa for the cost of their hotel rooms.

6.      The hotels did not meet the requirements for housing under federal law.

7.      Plaintiffs were required to pay Chapa for the cost of their inbound and outbound travel expenses from Texas to Iowa each year.

8.      From 2022 to 2024, Chapa and Remington employed foreign workers in the H-2A program in seed corn processing in Nebraska before, during, and after Plaintiffs' work season in Iowa.

9.      The H-2A program is tightly regulated. H-2A employers are legally required to recruit and hire qualified U.S. workers like the Plaintiffs for these jobs in preference to hiring foreign workers.

10.     H-2A employers must also pay their U.S. workers at least what the H-2A workers are paid if they are in "corresponding employment" with the H-2A workers.

11.     U.S. workers are in "corresponding employment" with H-2A workers if they perform the same agricultural work as the H-2A workers while their H-2A visas are valid.

12.     In 2022, Chapa actively concealed the existence of H-2A jobs in Nebraska from the Plaintiffs.

13.     In 2023, the Plaintiffs learned from Chapa that he was employing H-2A workers in Nebraska.

14.     The Plaintiffs expressed to Chapa that they were willing to work in the H-2A jobs in Nebraska in 2023.

15.     Chapa did not hire the Plaintiffs.

16.     Chapa told the Plaintiffs that H-2A workers had priority for the jobs in Nebraska in 2023.

17.    During 2022-2024, Plaintiffs were paid a significantly lower wage rate than Chapa's and Remington's H-2A workers performing the same jobs.

18.    Plaintiffs bring this suit to recover their unlawfully deducted transportation and housing costs, their appropriate pay rate as workers in "corresponding employment" with H-2A workers, and the damages they suffered as a result of Chapa's failure to recruit and hire them into the H-2A positions.

## II.    Jurisdiction and Venue

19.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332(a)(1), and 1337, as well as 29 U.S.C. §§ 216(b) and 1854.

20.    The federal claims in this action are authorized under 29 U.S.C. § 1854(a) and 29 U.S.C. § 216(b).

21.    The court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state law claims because these claims are so related to the federal claims that they form part of the same case and controversy.

22.    This court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000 and the matter is between citizens of different states.

23.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because all claims arose in this district.

24.    Declaratory relief is authorized pursuant to 28 U.S.C. §§ 2201 and 2202.

## III.    Parties

25.    Plaintiffs are seven migrant agricultural workers who are residents of Texas and who worked for Defendants in Iowa.

26.     Plaintiff Homero Reyes Reyes was employed by Defendants from approximately August to September each year from 2020-2024.

27.     At all relevant times, Plaintiff Homero Reyes Reyes was a migrant agricultural worker within the meaning of 29 U.S.C. § 1802(8)(A).

28.     At all relevant times, Plaintiff Homero Reyes Reyes was employed by Defendants within the meaning of the Migrant and Seasonal Agricultural Workers Protection Act ("AWPA"), 29 U.S.C. § 1802(5), and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 203(g).

29.     Plaintiff Manuel Ozuna Chavez worked for Defendants in Iowa from approximately August to September each year in 2020, 2021, 2022, and 2024.

30.     At all relevant times, Plaintiff Manuel Ozuna Chavez was a migrant agricultural worker within the meaning of 29 U.S.C. § 1802(8)(A).

31.     At all relevant times, Plaintiff Manuel Ozuna Chavez was employed by Defendants within the meaning of the AWPA, 29 U.S.C. § 1802(5), and the FLSA, 29 U.S.C. § 203(g).

32.     Plaintiff Luis Acuna was employed by Defendants from approximately August to September each year from 2020-2023.

33.     At all relevant times, Plaintiff Luis Acuna was a migrant agricultural worker within the meaning of 29 U.S.C. § 1802(8)(A).

34.     At all relevant times, Plaintiff Luis Acuna was employed by Defendants within the meaning of the AWPA, 29 U.S.C. § 1802(5), and the FLSA, 29 U.S.C. § 203(g).

35.     Plaintiff Antonio de la Rosa was employed by Defendants from approximately August to September each year from 2020-2024.

36.    At all relevant times, Plaintiff Antonio de la Rosa was a migrant agricultural worker within the meaning of 29 U.S.C. § 1802(8)(A).

37.    At all relevant times, Plaintiff Antonio de la Rosa was employed by Defendants within the meaning of the AWPA, 29 U.S.C. § 1802(5), and the FLSA, 29 U.S.C. § 203(g).

38.    Plaintiff Felipe Arevalo Gonzalez was employed by Defendants from approximately August to September each year from 2020-2024.

39.    At all relevant times, Plaintiff Felipe Arevalo Gonzalez was a migrant agricultural worker within the meaning of 29 U.S.C. § 1802(8)(A).

40.    At all relevant times, Plaintiff Felipe Arevalo Gonzalez was employed by Defendants within the meaning of the AWPA, 29 U.S.C. § 1802(5), and the FLSA, 29 U.S.C. § 203(g).

41.    Plaintiff Juan Antonio Cantu Gonzalez was employed by Defendants from approximately August to September each year from 2020-2024.

42.    At all relevant times, Plaintiff Juan Antonio Cantu Gonzalez was a migrant agricultural worker within the meaning of 29 U.S.C. § 1802(8)(A).

43.    At all relevant times, Plaintiff Juan Antonio Cantu Gonzalez was employed by Defendants within the meaning of the AWPA, 29 U.S.C. § 1802(5), and the FLSA, 29 U.S.C. § 203(g).

44.    Plaintiff Juan Lopez Escamilla was employed by Defendants from approximately August to September each year from 2020-2024.

45.    At all relevant times, Plaintiff Juan Lopez Escamilla was a migrant agricultural worker within the meaning of 29 U.S.C. § 1802(8)(A).

46.     At all relevant times, Plaintiff Juan Lopez Escamilla was employed by Defendants within the meaning of the AWPA, 29 U.S.C. § 1802(5), and the FLSA, 29 U.S.C. § 203(g).

        a.  *The Chapa Defendants*

47.     Defendant Javier Chapa is a farm labor contractor who maintains a permanent place of residence in Texas.

48.     Chapa is the principal of Defendant Chapa Global Contracting, Inc. and recruits, hires, supervises, transports, and houses migrant farmworkers in Texas, Iowa, and Nebraska.

49.     At all times relevant to this action, Chapa was Plaintiffs' employer within the meaning of the FLSA, 29 U.S.C. § 203(d).

50.     At all times relevant to this action, Chapa was Plaintiffs' employer within the meaning of the AWPA, 29 U.S.C. § 203(d)

51.     At all times relevant to this action, Chapa was a farm labor contractor within the meaning of the AWPA, 29 U.S.C. § 1802(7).

52.     At all times relevant to this action, Chapa was an agricultural employer within the meaning of the AWPA, 29 U.S.C. § 1802(2).

53.     Defendant Chapa Global Contracting, Inc., ("Chapa Global") is a Texas corporation and agricultural employer whose principal place of business is in Hidalgo County, Texas.

54.     Chapa Global operates as a farm labor contractor and H-2A labor contractor.

55.     Chapa Global recruits, hires, supervises, transports, and houses migrant farmworkers in Iowa and Nebraska.

56.     At all times relevant to this action, Chapa Global was Plaintiffs' employer within the meaning of the FLSA, 29 U.S.C. § 203(d).

57.     At all times relevant to this action, Chapa Global was Plaintiffs' employer within the meaning of the AWPA, 29 U.S.C. § 203(d)

58.     At all times relevant to this action, Chapa Global was a farm labor contractor within the meaning of the AWPA, 29 U.S.C. § 1802(7).

59.     At all times relevant to this action, Chapa Global was an agricultural employer within the meaning of the AWPA, 29 U.S.C. § 1802(2).

60.     At all times relevant to this action, the Chapa Defendants were an enterprise engaged in commerce within the meaning of the FLSA, 29 U.S.C. §203(s)(1)(A) in that they had employees who handled goods moved in and produced for commerce - namely seed corn - and had an annual gross volume of sales or business of not less than $500,000.

61.     At all times that Plaintiffs worked for Defendants from 2020 to 2024, the Chapa Defendants employed H-2A workers.

b.  *Remington Seeds*

62.     Defendant Remington Seeds, LLC, ("Remington") is one of the largest seed producers in the world. It is based in Remington, Indiana.

63.     Remington engages in seed corn farming and processing operations in Iowa.

64.     At all times relevant to this action, Remington had the power to fire Plaintiffs.

65.     At all times relevant to this action, Remington controlled the hours in which Plaintiffs were allowed to work.

66.     At all times relevant to this action, Remington owned the facility in which Plaintiffs worked.

67.     At all times relevant to this action, Remington controlled the facility in which Plaintiffs worked.

68.     At all times relevant to this action, Remington controlled access to the facility in which Plaintiffs worked.

69.     At all times relevant to this action, Remington set minimum expectations regarding how the Plaintiffs' work would be completed.

70.     At all times relevant to this action, Remington contracted with the Chapa Defendants to provide labor.

71.     At all times relevant to this action, Remington specified the number of workers that Chapa was to hire to perform labor at Remington's facilities.

72.     At all times relevant to this action, Remington was Plaintiffs' employer within the meaning of the FLSA, 29 U.S.C. § 203(d).

73.     At all times relevant to this action, Remington was Plaintiffs' employer within the meaning of the AWPA, 29 U.S.C. § 203(d)

74.     At all times relevant to this action, Remington was a farm labor contractor within the meaning of the AWPA, 29 U.S.C. § 1802(7).

75.     At all times relevant to this action, Remington was an agricultural employer within the meaning of the AWPA, 29 U.S.C. § 1802(2).

76.     At all times that Plaintiffs worked for Defendants from 2020 to 2024, Remington employed H-2A workers.

77.     At all times relevant to this action, Remington was engaged in commerce within the meaning of the FLSA, 29 U.S.C. §203(s)(1)(A) in that it had employees who handled goods moved in and produced for commerce - namely seed corn - and had an annual gross volume of sales or business of not less than $500,000.

78.    Each work season from 2020 to 2024, Remington contracted with the Chapa Defendants to obtain workers in their Iowa seed corn operations.

79.    Remington authorized the Chapa Defendants to recruit workers to fulfill its business needs through the H-2A program.

80.    At all relevant times, the Chapa Defendants had actual authority to recruit H-2A workers to perform services for Remington.

81.    At all relevant times, the Chapa Defendants had actual authority to recruit U.S. workers to perform services for Remington.

82.    At all relevant times, the Chapa Defendants had actual authority to bind Remington to the Plaintiffs' employment contracts.

## IV.    Factual background

### a. *Recruitment*

83.    Each year from 2020 to 2024, Remington contracted with the Chapa Defendants to recruit workers for its seed corn operations in Iowa and Nebraska.

84.    At all relevant times, the Chapa Defendants were acting in their capacity as agents of Remington.

85.    Each year from 2020 to 2024, the Chapa Defendants recruited both U.S. workers and H-2A workers for Remington and other farms.

86.    Each year from 2020 to 2024, Remington contracted with the Chapa Defendants to recruit and hire Plaintiffs.

87.    Each year from 2020 to 2024, Remington contracted with the Chapa Defendants to provide transportation to Plaintiffs.

88.    Each year from 2020 to 2024, Remington contracted with the Chapa Defendants to provide housing to Plaintiffs.

89.    Each year from 2020 to 2024, Defendants Chapa and Chapa Global (collectively, "the Chapa Defendants") recruited the Plaintiffs to travel from Texas to Iowa to work for Defendants in seed corn processing at Remington's DeWitt, Iowa facility.

90.    Each year in which they each worked from 2020 to 2024, the Plaintiffs contacted Chapa in July or August to inquire about the availability of work for Remington in seed corn processing.

91.    When Plaintiffs contacted Chapa each season, he confirmed the availability of their jobs and gave them information about when and where to meet him for their transportation to Iowa.

b. *Transportation*

92.    At the beginning of each work season in which Plaintiffs each worked from 2020 to 2024, the Chapa Defendants required Plaintiffs to gather in McAllen, Texas in approximately late August to travel on a bus chartered by Chapa to their housing in Iowa.

93.    At the end of each work season from 2020 to 2024, the Chapa Defendants required the Plaintiffs who worked that year to return to Texas on a bus chartered by Chapa.

94.    The Chapa Defendants required the Plaintiffs to reimburse them $450 each year to pay for their bus ride and meals consumed on their inbound and outbound transportation between Texas and Iowa.

95.    The Chapa Defendants did not allow Plaintiffs to drive their personal vehicles to Iowa.

96.     In each of the Plaintiffs' workweeks from 2022 through 2024 in which they were required to reimburse the Chapa Defendants for inbound and outbound transportation expenses, they worked more than 40 hours per week.

97.     In each of the Plaintiffs' workweeks from 2022 through 2024 in which they were required to reimburse the Chapa Defendants for inbound and outbound transportation expenses, their inbound transportation costs reduced their wages below the required overtime premium.

98.     In at least one workweek each season from 2022 through 2024, the amount of money each Plaintiff paid to reimburse the Chapa Defendants for their transportation expenses caused their wages to fall below the required overtime premium.

99.     At all relevant times, the Chapa Defendants knew or should have known that the FLSA requires employers to reimburse employees for expenses that employees incur primarily for the benefit of the employer or recklessly disregarded this obligation.

100.    Each year from 2020 to 2024, the Chapa Defendants applied for temporary certification of H-2A visas to the U.S. Department of Labor to work for Remington seed processing operations in Nebraska.

101.    The Chapa Defendants' knew that the FLSA "imposes obligations on employers" concerning inbound transportation costs because their H-2A work contracts state this. *E.g.* Exh. A at 9.

102.    Chapa personally attested under penalty of perjury, in his capacity as the principal of Chapa Global, that he had read and understood the H-2A job orders the Chapa Defendants filed each year.

103.    At all relevant times, the Chapa Defendants knew that Plaintiffs were traveling to Iowa primarily for the benefit of their employers.

104.    Each workday during the 2023 and 2024 work seasons, the Chapa Defendants required Plaintiffs who worked that year to board a bus each morning from their housing to their worksite.

105.    At the end of each workday during the 2023 and 2024 work seasons, the Chapa Defendants required Plaintiffs who worked that year to board a bus from the worksite to their housing.

106.    The bus ride between the hotel and the worksite was primarily for the Chapa Defendants' convenience.

107.    Plaintiffs were unable to secure their own transportation between the hotel and the worksite because the Chapa Defendants required them to ride their bus.

108.    Plaintiffs were unable to secure their own transportation between the hotel and worksite because the Chapa Defendants forbade them to drive their personal vehicles to Iowa.

109.    Defendants did not pay Plaintiffs for their travel time between the hotel and worksite each day.

c. *Housing*

110.    Each season, the Chapa Defendants' crew of workers for Remington's seed processing facility in DeWitt, Iowa, were housed in Clinton, Iowa.

111.    On arriving in Iowa each season, the Chapa Defendants required the workers to stay for the season at a hotel in Clinton.

112.    The Chapa Defendants and the hotel operators forbade Plaintiffs to eat from the hotel's complimentary breakfast each morning.

113.    Each year from 2020 to 2024, the Chapa Defendants required Plaintiffs who worked that year to pay for the cost of their hotel rooms.

114.    Remington provided the Chapa Defendants with money to provide housing to the Chapa Defendants' employees.

115.    Federal law provides that any person who owns or controls housing used by migrant agricultural workers must ensure that the housing complies with substantive federal safety and health standards. 29 U.S.C. § 1823(a).

116.    The Chapa Defendants do not regularly provide housing on a commercial basis to the general public.

117.    The Chapa Defendants did not ensure that the housing they provided to Plaintiffs met federal standards for migrant farmworker housing.

118.    The housing provided by the Chapa Defendants did not meet federal standards for migrant farmworker housing.

119.    Each year from 2020 to 2024, the Chapa Defendants only rented one hotel room with two beds for approximately every four workers.

120.    Plaintiffs were thus forced to either share beds or to sleep on the floor.

121.    At all relevant times, the Chapa Defendants knew or should have known that the housing did not meet federal standards, or recklessly disregarded this obligation.

122.    During each of the Plaintiffs' work seasons from 2022-2024, Defendants were employers of H-2A workers.

123.    On their applications for H-2A employment certification, the Chapa Defendants agreed to comply with applicable local, state, and federal standards for migrant farmworker housing. *E.g.* Exh. A at 12.

124.    Each year from 2022 to 2024, Chapa personally certified under penalty of perjury, in his capacity as the principal of Chapa Global, that he had read and reviewed these requirements on his applications for H-2A employment certification. *Id.* at X, Y, Z.

125.    Each year from 2022 to 2024, Defendants knew that U.S. workers in corresponding employment with H-2A workers were entitled to housing free of charge.

126.    From at least 2022 through 2024, the Chapa Defendants provided housing for H-2A workers in Iowa.

127.    From at least 2022 through 2024, the Chapa Defendants were aware of federal law requirements for migrant farmworker housing.

128.    It was unlawful for the Chapa Defendants to require Plaintiffs to pay for their housing because Plaintiffs were U.S. workers in corresponding employment with H-2A workers.

129.    It was unlawful for the Chapa Defendants to require Plaintiffs to pay for their housing because the housing did not meet federal standards for migrant farmworker housing.

130.    It was unlawful for the Chapa Defendants to require Plaintiffs to pay for their housing because the housing was primarily for the benefit of Defendants, and Plaintiffs' kickbacks to the Chapa Defendants to pay for the hotel brought their wage under the required overtime compensation.

131.    The housing was primarily for the benefit of Defendants because Plaintiffs were required to stay there, because Plaintiffs had traveled to Iowa solely for the purpose of working for Defendants, because the Chapa Defendants had already been paid by Remington for the workers' hotel rooms, and because the Chapa Defendants required Plaintiffs to gather at the Quality Inn each morning to catch a bus to their worksite.

132.    Plaintiffs' kickbacks to the Chapa Defendants were deductions that brought their wages under the required overtime in each workweek from 2022 to 2024.

133.    In at least one workweek each season from 2022 through 2024, the amount of money each Plaintiff paid to reimburse the Chapa Defendants for their transportation expenses caused their wages to fall below the required overtime premium.

134.    Plaintiffs suffered damages as a result of staying in the substandard housing at the Quality Inn. They suffered mental and emotional distress because they were not provided with individual beds and were required to either sleep on the floor or share beds, and because they were discriminated against compared to members of the general public because they were not allowed to eat the hotel's breakfast.

    d. *Job duties and pay*

135.    During each of Plaintiffs' work seasons from 2020 to 2024, Plaintiffs worked from approximately late August to approximately late September or early October in seed corn sorting, processing, and packing at Remington's facility in DeWitt, Iowa.

136.    Plaintiffs' job duties included seed corn sorting and processing.

137.    Plaintiffs' job duties included removing unwanted plants from the production line.

138.    Each workweek Plaintiffs at Remington's facility in DeWitt sorted and processed seed corn grown by Remington.

139.    Each workweek Plaintiffs sorted and processed seed corn grown by other farms.

140.    In 2022, the Chapa Defendants paid Plaintiffs $13 per hour for the first 40 hours each workweek, and $19.50 per hour for each hour after 40 each workweek.

141.    In 2023, the Chapa Defendants paid Plaintiffs $14 per hour for the first 40 hours each workweek, and $21 per hour for each hour after 40 each workweek.

142.    In 2024, the Chapa Defendants paid Plaintiffs $14.25 per hour for the first 40 hours each workweek, and $21.37 per hour for each hour after 40 each workweek.

e. *Chapa and Remington's H-2A jobs*

143.    Each year from at least 2020 to 2024, the Chapa Defendants provided workers to Remington through the H-2A visa program.

144.    The H-2A program provides temporary work visas to individuals from foreign countries to work in the U.S. in agriculture for up to 10 months each year.

145.    To participate in the H-2A program, agricultural employers and their labor contractors must follow strict federal regulations designed to ensure that American workers are genuinely unavailable and that hiring H-2A workers will not have the effect of lowering the wages and working conditions of American workers.

146.    H-2A employers must provide workers with free housing and free transportation from their permanent residence to and from the job site. 20 C.F.R. § 655.122(d), (h).

147.    H-2A employers must ensure that housing meets applicable local, state, and federal standards, and must obtain a pre-occupancy inspection of the housing if it is not offered to the general public under the same terms and conditions. 20 C.F.R. § 655.122(d).

148.    H-2A employers must pay a wage rate approved by the U.S. Department of Labor. 20 C.F.R. § 655.120.

149.    H-2A employers must provide a written copy of the work contract to their H-2A and U.S. worker employees. 20 C.F.R. § 655.122(q).

150.    In order to obtain H-2A employees, employers are required to attempt to first recruit U.S. workers and must demonstrate that there are no U.S. workers available, qualified, and willing to do the job.

151.    Employers are legally obligated to hire U.S. workers who apply for H-2A jobs within the first half of the work contract period.

152.    Each work season, H-2A employers must submit a "job order" to the U.S. Department of Labor" for approval. The job order contains the terms and conditions of employment for H-2A workers and U.S. workers in corresponding employment and forms the work contract between the employer and those workers.

153.    The job protections in the H-2A regulations are terms and conditions in the work contract for both H-2A workers and to U.S. workers in "corresponding employment" with H-2A workers. 20 C.F.R. § 655.122(a), (q), § 655.103(b) (definition of "work contract").

154.    The terms of the job order thus become part of the working arrangement between an H-2A employer and U.S. workers in corresponding employment.

155.    Each summer from 2020-2024 in approximately June and July, the Chapa Defendants provided Remington with H-2A employees in Iowa for various tasks in corn production and harvesting, including rogueing, detasseling, and seed corn sorting. Exh. A at 2-80.

156.    From 2022-2024, the Chapa Defendants were certified by the USDOL to provide Remington with H-2A employees in Nebraska in seed corn sorting and processing from approximately August to October. These workers' job duties included sorting corn, monitoring corn sorting and processing machines, and moving bags of processed seed corn. Exh. A. at 81-118.

157.    From 2023-2024, the Chapa Defendants were certified by the USDOL to provide Remington with H-2A employees in Nebraska in seed corn processing, bagging, and packing

from approximately August until February. These workers' job duties included processing, bagging, rebagging, packing, and moving seed corn. Exh. A at 119-144.

158.    The USDOL approves an initial pay rate for each H-2A job when it begins.

159.    Each year, the USDOL updates its "adverse effect wage rates" ("AEWRs") for each state, which are used as wage rates in the H-2A program. 20 C.F.R. § 655.120(b). When the USDOL determines that a state's AEWR should be higher during an H-2A contract, the employer must begin paying the higher wage rate on the date the new AEWR becomes effective. 20 C.F.R. § 655.120(b)(3).

160.    The Chapa Defendants' H-2A job orders included a promise to pay any increased AEWRs as required by law. *E.g.* Exh. A. at 11.

161.    The pay rate for the Chapa Defendants' H-2A workers for Remington in Nebraska in 2022 was $16.47 per hour. Exh. A at 81.

162.    The pay rate for the Chapa Defendants' H-2A workers for Remington in Nebraska in 2023 was $17.33 per hour. Exh. A at 93, 119.

163.    The pay rate for the Chapa Defendants' H-2A workers for Remington in Nebraska in 2024 was $18.32 per hour. Exh. A at 106, 132.

164.    The pay rate for the Chapa Defendants' H-2A workers for Remington in Nebraska in 2025 was $19.21 per hour. Labor Certification Process for the Temporary Employment of Foreign Workers in Agriculture in the United States: Adverse Effect Wage Rates for Non-Range Occupations, 89 Fed. Reg. 101628 (Dec. 16, 2024)

165.    Each year from 2022 to 2024, Plaintiffs were in corresponding employment with the Chapa Defendants' and Remington's H-2A employees in Nebraska.

166.    During the period in which the Chapa Defendants' job orders for Remington were valid each year from 2022 to 2024, Plaintiffs performed work for Chapa and Remington that was included on their job orders.

167.    Specifically, Plaintiffs processed and sorted seed corn.

168.    During the period in which the Chapa Defendant's job orders for Remington were valid each year from 2022 to 2024, Plaintiffs performed agricultural work for Chapa and Remington that their H-2A employees performed.

169.    Specifically, Plaintiffs were employed in a processing facility owned and operated by Remington as part of Remington's integrated farming operations.

170.    Even though Plaintiffs were in corresponding employment with Defendants' H-2A employees, Defendants did not provide them with the employment terms to which they were entitled as corresponding workers.

171.    Specifically, Defendants did not:

a.  Pay the Plaintiffs at least the AEWR for each hour worked;

b.  Pay the Plaintiffs an overtime premium based on a regular rate of at least the AEWR for each hour worked over 40 in a workweek;

c.  Provide the Plaintiffs with housing free of charge;

d.  Provide the Plaintiffs with transportation from their place of residence to Iowa free of charge;

e.  Provide the Plaintiffs with return transportation from Iowa to their place of residence free of charge; and

f.  Provide the Plaintiffs a copy of the work contract.

172.    Defendants did not offer to Plaintiffs the same benefits, wages, and working conditions that they offered to their H-2A employees.

      f. *Chapa's concealment of H-2A jobs and failure to hire the Plaintiffs*

173.    From 2020 to 2022, Chapa actively concealed H-2A work for Remington from the Plaintiffs.

174.    From 2020-2022 Chapa did not tell the Plaintiffs about the H-2A jobs.

175.    During the 2023 season, Chapa told Plaintiffs that after the Plaintiffs' work season finished he would be traveling to Nebraska to do more work for Remington.

176.    Plaintiffs expressed to Chapa that they were interested in working for Defendants in Nebraska.

177.    Chapa told Plaintiffs that he could not hire them to work for Remington in Nebraska.

178.    Chapa told Plaintiffs that H-2A workers had hiring preference for the work for Remington in Nebraska.

179.    Chapa could have hired Plaintiffs to perform work on the H-2A job orders for Remington in Nebraska.

180.    Chapa knew that he could have hired Plaintiffs to perform work on the H-2A job orders for Remington in Nebraska.

181.    H-2A workers did not have lawful hiring preference for the H-2A jobs for Remington in Nebraska.

182.    Chapa knew that H-2A workers did not have hiring preference for the H-2A jobs for Remington in Nebraska.

183.    The Chapa Defendants were legally obligated to hire U.S. workers for the H-2A jobs in Nebraska if they were available and qualified to perform the work.

184.    The Plaintiffs are U.S. workers who were available and qualified to perform the work being offered by Defendants in Nebraska.

185.    Chapa intended to deceive Plaintiffs into believing that he could not hire them to work for Remington in Nebraska.

186.    In reasonable reliance on Chapa's misrepresentations, Plaintiffs did not further pursue employment with Defendants in Nebraska in the 2023 or 2024 seasons.

187.    Plaintiffs did not further pursue employment with Defendants in Nebraska in the 2023 and 2024 seasons because they relied on Chapa's representation that H-2A workers had hiring preference for those jobs.

188.    The Chapa Defendants refused to hire the Plaintiffs for the H-2A job orders in Nebraska in 2023 and 2024.

189.    The Plaintiffs returned home from Iowa in late September or early October of 2023 and 2024, even though in both years the Chapa Defendants had H-2A work available until February. Exh. A at 119 and 132.

190.    As a result of the Chapa Defendants' failure to hire them, Plaintiffs' earnings were diminished.

191.    At all relevant times, Plaintiffs were qualified and willing to perform the H-2A jobs in Nebraska for which the Chapa Defendants refused to hire them.

**V.    Causes of Action**

**A.  Cause of Action 1: Violations of the Migrant and Seasonal Agricultural Worker Protection Act (AWPA), 29 U.S.C. § 1801 et seq. (against all Defendants)**

192.    Plaintiffs allege and incorporate by reference each allegation contained in this complaint.

193.    The Chapa Defendants intentionally violated all Plaintiffs' rights under the AWPA from 2022-2024 by knowingly providing false and misleading information to the Plaintiffs regarding the terms and conditions of agricultural employment, in violation of 29 U.S.C. § 1821(f).

194.    Defendants intentionally violated Plaintiffs' rights under the AWPA from 2020 to 2024 by failing to pay them their wages owed when due, in violation of 29 U.S.C. § 1822(a), by:

    a.   Unlawfully deducting from Plaintiffs' wages by requiring them to kick back housing and travel expenses to the Chapa Defendants; and

    b.   Failing to pay Plaintiffs for their time spent traveling between their housing and worksite.

195.    Defendants intentionally violated Plaintiffs' rights under the AWPA from 2022 to 2024 by failing to pay them their wages owed when due, in violation of 29 U.S.C. § 1822(a), by:

    a.   Failing to pay Plaintiffs at least the wage that they paid to their H-2A employees in corresponding employment; and

    b.   failing to pay Plaintiffs overtime at a regular rate of pay of at least the wage they paid to their H-2A employees in corresponding employment.

196.    Defendants intentionally violated all Plaintiffs' rights under the AWPA from 2022-2024 by violating without justification the terms of the working arrangement made with Plaintiffs, in violation of 29 U.S.C. § 1822(c).

197.    The Chapa Defendants intentionally violated all Plaintiffs' rights under the AWPA from 2020-2024 by:

a.   failing to ensure that the housing provided to Plaintiffs complied with applicable substantive federal and state health and safety standards, in violation of 29 U.S.C. § 1823(a);

b.   failing to obtain and post certification from an appropriate authority that the housing provided to Plaintiffs complied with applicable substantive federal and state health and safety standards before any migrant farmworkers occupied it, in violation of 29 U.S.C. § 1823(b)(1); and,

c.   failing to post in a conspicuous place or present to each Plaintiff a statement of the terms and conditions of occupancy of the housing provided, in violation of 29 U.S.C. § 1821(c).

**B.  Cause of Action 2: Breach of Contract (against all Defendants)**

198.   Plaintiffs allege and incorporate by reference each allegation contained in this complaint.

199.   At all times relevant to this action, and in all of the Chapa Defendants' actions and omissions set forth in this Complaint, the Chapa Defendants acted as agents for Remington in regard to dealings with Plaintiffs and acted within the scope of their agency.

200.   At all times relevant to this action, the Chapa Defendants had actual authority to recruit workers to perform services for Remington and acted within the scope of their agency.

201.   At all times relevant to this action, the Chapa Defendants had actual authority to bind Remington to the employment contracts with Plaintiffs.

202.   By the acts and omissions set forth in this complaint, and by other acts and omissions, Remington held out the Chapa Defendants as having authority to conduct business on Remington's behalf.

203.    Remington had full knowledge of the material facts set out in paragraph 202.

204.    On the basis of the facts set forth herein, including but not limited to those in paragraph 202, Plaintiffs had a reasonable belief that the Chapa Defendants had the authority to conduct business on behalf of Remington, including the formation of employment contracts with workers.

205.    The Chapa Defendants therefore had apparent authority to bind Remington to the employment contracts with Plaintiffs.

206.    Justifiably relying on the Chapa Defendants' apparent authority to bind Remington to the employment contracts with Plaintiffs, Plaintiffs traveled to the worksite, worked, accepted a lower pay rate than the AEWR, and paid housing and other various fees as directed by the Chapa Defendants.

207.    Each work season from 2022 to 2024, Defendants materially breached each contract of employment into which they entered with each of Plaintiffs by failing to comply with the promised terms and conditions of employment.

208.    As a direct consequence of the breach of the employment contract by Defendants, Plaintiffs suffered damages and substantial injury.

209.    The damages of each Plaintiff, including but not limited to lost wages, were incurred as natural, probable, and foreseeable consequences of the above-described material breaches of their contracts with Defendants.

210.    Defendants are therefore liable jointly and severally to each Plaintiff for actual, incidental, and consequential damages.

**C.  <u>Cause of Action 3: Unpaid overtime under the Fair Labor Standards Act (against all Defendants)</u>**

211.    Plaintiffs allege and incorporate by reference each allegation contained in this complaint.

212.    From 2022 to 2024, Defendants violated the overtime wage provisions of the FLSA, 29 U.S.C. § 207(a), by failing to pay Plaintiffs at least 1.5 times their legally-authorized regular rate of pay for the workweeks in which they worked in excess of 40 hours.

213.    Specifically, requiring Plaintiffs to kick back transportation and housing expenses caused Plaintiffs' wages to fall below 1.5 times their regular rate of pay.

214.    Defendants' violations of the FLSA's overtime provisions as set out in this count were willful within the meaning of 28 U.S.C. § 255(a).

215.    Defendants showed reckless disregard as to whether their failure to pay overtime wages was prohibited by the FLSA.

216.    Although Defendants were on notice that workers in corresponding employment with H-2A workers were required to be paid at least the same wages as the H-2A workers, Defendants maintained a policy of paying their U.S. workers less than their H-2A employees.

217.    Defendants paid Plaintiffs' overtime at a regular rate of pay lower than their H-2A workers' rate of pay.

218.    Plaintiffs are each entitled to recover their unpaid overtime wages, plus an additional equal amount in liquidated damages, and attorney's fees and costs in accordance with 29 U.S.C. § 216(b).

**D. <u>Cause of Action 4: Unpaid wages under the Iowa Wage Payment Collection Law, Iowa Code § 91A (against all Defendants)</u>**

219.    Plaintiffs allege and incorporate by reference each allegation contained in this complaint.

220.    In the 2023 and 2024 work seasons, Defendants failed to pay Plaintiffs their wages due, in violation of Iowa Stat. §§91a.3, by:

    a.    Unlawfully deducting from Plaintiffs' wages by requiring them to kick back housing and travel expenses to the Chapa Defendants;

    b.    Failing to pay Plaintiffs for their time spent traveling between their housing and worksite;

    c.    Failing to pay Plaintiffs at least the wage that they paid to their H-2A employees in corresponding employment; and

    d.    Failing to pay Plaintiffs overtime at a regular rate of pay of at least the wage they paid to their H-2A employees in corresponding employment.

221.    In the 2023 and 2024 work seasons, Defendants failed to pay Plaintiffs for their time spent traveling between their housing and worksite, even though the transportation was required by Defendants and was primarily for the convenience of Defendants, in violation of Iowa Stat. §§ 91a.3 and 91a.13.

222.    Plaintiffs are entitled to recover their wages due under Iowa Stat. § 91a.3.

**E.  Cause of Action 5: Fraudulent misrepresentation (against all Defendants)**

223.    Plaintiffs allege and incorporate by reference each allegation contained in this complaint.

224.    In 2023, the Chapa Defendants represented to Plaintiffs that:

    a.    Defendants were unable to hire Plaintiffs for work in Nebraska following the end of the work season in Iowa; and

    b.    H-2A workers had hiring preference over Plaintiffs for those jobs.

225.    These representations were false.

226.    These representations were material to Plaintiffs' employment decisions.

227.    The Chapa Defendants knew or should have known that these representations were false, or had reckless disregard for their truth.

228.    The Chapa Defendants made these representations with the intent to deceive Plaintiffs into not pursuing further employment with Defendants.

229.    Plaintiffs justifiably relied on these representations.

230.    Plaintiffs suffered diminished earning capacity as a result of their reliance on the Chapa Defendants' statements.

231.    The Chapa Defendants made these statements with willful or wanton disregard for Plaintiffs' rights.

232.    The Chapa Defendants directed their fraudulent misrepresentations at the Plaintiffs.

233.    Remington encouraged the Chapa Defendants to seek H-2A workers instead of U.S. workers to fulfill detasseling work for Remington.

234.    The Chapa Defendants acted with actual authority on behalf of Remington in making these fraudulent misrepresentations.

235.    The Chapa Defendants acted with apparent authority on behalf of Remington in making these fraudulent misrepresentations.

236.    Plaintiffs are entitled to recover their pecuniary losses, including lost wages, as well as punitive damages.


## **Prayer for Relief**

Plaintiffs respectfully request that this Court grant them the following relief:

a.  Enter declaratory judgment that the Defendants intentionally violated the Plaintiffs' rights under the AWPA as set forth in the preceding paragraphs;

b.  Award each Plaintiff the greater of their statutory damages or, in the alternative, actual damages for the Defendants' violations of the AWPA;

c.  Enter an injunction requiring the Defendants to comply with the AWPA;

d.  Enter declaratory judgment that Defendants willfully violated the rights of the Plaintiffs under the FLSA as set forth in the preceding paragraphs;

e.  Enter declaratory judgment that Defendants violated the rights of the Plaintiffs under IWPCL as set forth in preceding paragraphs;

f.  Award Plaintiffs their unpaid overtime wages, plus an additional equal amount as liquidated damages, and their attorneys' fees and costs for Defendants' violations of the FLSA and the IWPCL;

g.  Award Plaintiffs their pecuniary losses and punitive damages against Defendants for Defendants' fraudulent misrepresentations;

h.  Award the Plaintiffs pre-judgment and post-judgment interest, as allowed by law, and

i.  Award the Plaintiffs all other relief to which they may be justly entitled.


Respectfully Submitted,

**LEGRANT LAW FIRM, P.C.**

By  /s/ Andrew L. LeGrant
Andrew L. LeGrant
AT0008908
12257 University Ave, Suite 201

Clive, Iowa 50325
Telephone: (515) 331-6500
Facsimile: (855) 331-6509
alegrant@legrantlaw.com

**ASSOCIATE COUNSEL**
/ATTORNEY FOR PLAINTIFFS


David Mauch
Texas Bar No. 24086837
Texas RioGrande Legal Aid,
Inc.
121 S. Main St., Ste. 300
Victoria, TX 77901
Phone: (361) 237-1681
Fax: (956) 591-8752
dmauch@trla.org
*Motion for admission pro hac
vice forthcoming*

E. Sidonia Mitchell
Texas Bar No. 24125331
Texas RioGrande Legal Aid,
Inc.
300 S. Texas Blvd.
Weslaco, TX 78596
Phone: (956) 825-3158
Fax: (956) 591-8752
smitchell@trla.org
*Motion for admission pro hac
vice forthcoming*

Lakshmi Ramakrishnan
Texas Bar No. 24037324
S. Dist. No.: 33872
Texas RioGrande Legal Aid,
Inc.
300 S. Texas Blvd.
Weslaco, Texas 78596
Phone: (956) 447-4850

Fax: (956) 591-8752
lramakrishnan@trla.org
*Motion for admission pro hac
vice forthcoming*

TEXAS RIOGRANDE
LEGAL AID, INC.

*Attorneys for Plaintiffs*